# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

DOUCET-SPEER, APLC, *ET AL.*                          CIVIL ACTION

VERSUS                                               20-513-SDD-RLB

STATE FARM FIRE AND CASUALTY COMPANY

## <u>RULING</u>

This matter is before the Court on the Motion for Partial Summary Judgment[1] filed by Plaintiff Doucet-Speer, APLC ("Doucet-Speer") regarding coverage. State Farm Fire and Casualty Company ("State Farm") filed an Opposition,[2] to which Doucet-Speer replied.[3] Also before the Court is State Farm's Motion for Summary Judgment[4] as to all claims. Doucet-Speer opposes,[5] and State Farm replied.[6] For the reasons which follow, the Doucet-Speer's Partial Motion for Summary Judgment[7] shall be denied, and State Farm's Motion for Summary Judgment[8] shall be granted in part and denied in part.

---

[1] Rec. Doc. 95.
[2] Rec. Doc. 104
[3] Rec. Doc. 108.
[4] Rec. Doc. 97.
[5] Rec. Doc. 103. Jeffrey Speer ("Speer") did not file an Opposition. Local Rule 7(f) of the Middle District of Louisiana requires that memoranda in opposition to a motion be filed within twenty-one (21) days after service of the motion. Moreover, State Farm's undisputed facts are uncontroverted, and the Court finds State Farm's motion as to Speer has merit and is supported. Thus, State Farm's Motion for Summary Judgment is GRANTED to the extent it seeks dismissal of Speer's claims with prejudice.
[6] Rec. Doc. 107.
[7] Rec. Doc. 95.
[8] Rec. Doc. 97.

## I.    FACTUAL BACKGROUND

On or about July 6, 2020, the law firm Doucet-Speer filed suit in the Nineteenth Judicial District Court for the Parish of East Baton Rouge, State of Louisiana, against State Farm to obtain coverage and bad faith penalties after State Farm denied a claim for losses resulting from employee theft and fraud.[9] Doucet-Speer alleges that the State Farm policy provides coverage for: "(1) each occurrence of Employee Dishonesty causing [Doucet-Speer] to sustain loss; (2) each occurrence of loss resulting from Forgery or Alteration of any check, draft, or promissory note, etc.; and (3) each occurrence of loss of Business Personal Property of others."[10]

On August 11, 2020, State Farm removed, asserting diversity jurisdiction under 28 U.S.C. §1332,[11] and State Farm answered.[12] On November 3, 2021, the Court granted Doucet-Speer's motion to amend to add Jeffrey Speer ("Speer") as a plaintiff, a breach of contract claim, and additional factual allegations to support their claims against State Farm.[13]

Doucet-Speer and Speer (collectively, "Plaintiffs") allege that State Farm provided a policy of insurance which covered the business against perils, including (1) $10,000.00 for employee dishonesty, (2) $1,000,000.00 for business liability, and (3) $2,000,000.00

---

[9] Rec. Doc. 1-2 at ¶¶2-9.
[10] *Id.* at ¶5.
[11] Rec. Doc. 1.
[12] Rec. Doc. 3.
[13] Rec. Docs. 34-1, 40, 41. The Amended Complaint was filed by Speer in proper person on his own behalf and as counsel for Doucet-Speer. Rec. Docs. 33, 41. Speer was later transferred to Disability Inactive Status and could no longer practice law. Rec. Doc. 97-2 at p. 2. After several withdrawals and enrollments of counsel and dismissal of the case without prejudice, Plaintiffs' current counsel of record enrolled for Doucet-Speer and the case was reinstated. Rec. Docs. 73, 76. Speer, who was proceeding *pro se* passed away on December 30, 2024. Rec. Doc. 109. This Court, after the filing of the instant motions, allowed substitution of John Anthony Speer, the Testamentary Executor for the Estate of Jeffrey F. Speer, as the proper party to substitute for Speer, and allowed attorney Mark Owens to enroll on behalf of the substitute Plaintiff. Rec. Doc. 130 at p. 4. Doucet-Speer remains a named party Plaintiff. Rec. Doc. 130 at p. 9.

general aggregate for liabilities.[14] Plaintiffs allege that prior to insurance agent John Montesano's ("Montesano's") passing in October of 2015, Speer requested additional Uninsured/Underinsured coverage in the amount of $2,000,000.00 and was sold additional coverage in the form of endorsements, including but not limited to Underinsured/Uninsured Motorist, Liability coverage, Employee Dishonesty, as well as Corporation General Liability ("CGL"), in the amount of $2,000,000.00.[15]

By the end of summer 2019, Plaintiffs allege Speer was unable to get satisfactory statements from his bookkeeper and office manager about the financial state of affairs of the law practice.[16] Upon investigation, Speer discovered substantial sums of money missing and terminated all involved employees.[17] After discovering the total amount of damage, Speer allegedly asked his insurance agent Trey Hargrove ("Hargrove") if the policy that he had been paying covered the situation.[18]

Plaintiffs claim that Hargrove affirmed that the CGL and endorsements covered the loss, damages, and liabilities incurred by the law firm.[19] Plaintiffs allege Hargrove informed Speer that, "in situations where your employees act in a manner that creates liability to third parties, then your policy will cover that debt up to your two-million-dollar aggregate limit."[20] After submitting a proof of loss on December 2 and 12, 2019, State Farm tendered a check in the amount of $10,000.00 to Speer under the Employee Dishonesty coverage and denied the remaining claims.[21]

---

[14] Rec. Doc. 41 at ¶5.
[15] *Id.* at ¶¶7-8.
[16] *Id.* at ¶10.
[17] *Id.* at ¶¶11-13.
[18] *Id.* at ¶15.
[19] *Id.*
[20] *Id.* at ¶16.
[21] *Id.* at ¶¶18-20.

State Farm answered the Supplemental and Amended Petition.[22] Now Plaintiffs seek partial summary judgment[23] as to coverage, and State Farm seeks summary judgment[24] as to all claims by Plaintiffs. The motions are opposed, respectively.[25]

## II.    LAW AND ANALYSIS

### A. Summary Judgment Standard

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[26] The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact.[27] A court must deny the motion for summary judgment if the movant fails to meet this burden.[28]

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."[29] This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim.[30] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[31]

---

[22] Rec. Doc. 46.
[23] Rec. Doc. 95.
[24] Rec. Doc. 97.
[25] Rec. Docs. 103, 104.
[26] Fed. R. Civ. P. 56.
[27] *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).
[28] *Id.*
[29] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted).
[30] *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990) (citing *In re Mun. Bond Rep. Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982)).
[31] *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment.[32] The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.[33] Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party.[34]

### B. Plaintiffs' Partial Summary Judgment

Doucet-Speer seeks partial summary judgment as to coverage. It is undisputed that Doucet-Speer, at all pertinent times, was a first-party insured of State Farm through the CGL Policy, #98-BM-G174-4 (the "Policy").[35] However, the following facts are disputed. Doucet-Speer asserts that State Farm, through its agent Hargrove, undertook actions and made representations to Doucet-Speer through Speer, that Doucet-Speer had coverage for the alleged theft detailed in this suit.[36] Doucet-Speer further contends that Speer, relying on Hargrove's representations, had a reasonable expectation that Doucet-Speer was indeed covered for the losses sustained.[37]

Based on Hargrove's deposition testimony, Doucet-Speer contends Hargrove unquestionably represented to Plaintiffs that there was coverage afforded under the Policy in the amount of a one million or two-million-dollar aggregate.[38] Plaintiffs also cite Speer's deposition testimony that Hargrove told him he believed Speer was "covered up to the 2 million-dollar limits of that rider."[39] Speer further testified that he asked Hargrove

---

[32] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).
[33] *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000).
[34] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).
[35] Rec. Docs. 95-2, 104-1.
[36] Rec. Docs. 95-2 at p. 1, 104-1 at p. 2.
[37] *Id.*
[38] Rec. Doc. 95-3 at p. 8 (citing Rec. Doc. 95-8 at p. 16)
[39] *Id.* at p. 9 (citing Rec. Doc. 95-8 at p. 16).

to go back and confirm with underwriting what he was telling him to be sure.[40] Speer testified that Hargrove returned the next day and said "You're covered."[41] Specifically, Speer testified he recalled Hargrove did air quotation marks and said, "You're covered for debts that are caused by the misconduct, fraud, criminal activity that would lead to your being liable to a third party."[42] Thus, Doucet-Speer argues that Hargrove, acting as an agent for State Farm, substantiated and confirmed coverage was afforded to Doucet-Speer, upon which Speer relied.[43] Based on this evidence, Doucet-Speer contends there is no genuine issue of material fact, and it is entitled to summary judgment as to coverage.

Doucet-Speer argues that Hargrove's representations illustrate that "Speer was advised that coverage was afforded under his Policy by the individual that was obligated with the duty 'to procure insurance coverage.'"[44] Doucet-Speer further argues Hargrove's testimony supports Plaintiffs' "subjective" position.[45] Doucet-Speer contends that when Speer met with Hargrove and discussed coverage, the Sworn Proof of Loss was provided to State Farm detailing the losses that were discovered.[46] Doucet-Speer contends Hargrove never advised Speer that there was no coverage or that the Policy was not applicable.[47]

Hargrove testified that he remembered getting a call from Jeff and that he remembered "the call being like a hypothetical."[48]  Hargrove also testified that Speer

---

[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.* at p. 10.
[44] *Id.* at p. 8 (citing *J & M Pile Driving, LLC v. Chabert Ins. Agency, LLC*, 2017-0126, p. 4 (La. App. 1 Cir. 10/25/17); 233 So.3d 43).
[45] *Id.* at pp. 8-9.
[46] *Id.* at p. 9.
[47] *Id.*
[48] *Id.* at p. 7 (citing Rec. Doc. 95-6 at p. 30).

asked "if I had an employee, you know, stealing money from me or this or that," "would I have coverage for that?"[49] Hargrove testified that he remembered "seeing the employee dishonesty kind of coverage and I remember telling him something, like, 'Yeah, you know, you would – you would have coverage for that.'"[50] He further testified that at some point he and Speer discussed the amount of coverage and Speer said "hey, do I have the one million, two-million-aggregate, you know, yes."[51]

State Farm argues the testimony fails to establish that there are no genuine issues of material fact regarding coverage and/or the amount based on Hargrove's purported representations to Speer.[52] State Farm denies that Hargrove's testimony establishes that he told Speer he was covered for up to $2 million under the Employee Dishonesty Coverage Endorsement, which is limited to $10,0000 as set forth on the declarations page of the Policy.[53]

State Farm maintains that Doucet-Speer's assertions are contrary to recent caselaw holding that, "as Louisiana requires that insurance contracts must be in writing, reliance on oral representations by the insurance agent was unreasonable as a matter of law as the oral representations were inconsistent with the unambiguous terms of the contract."[54] State Farm further contends Doucet-Speer fails to mention Louisiana Supreme Court caselaw holding that insurance agents owe no duty to advise their clients as to the type and amount of coverage to obtain and that the insured is obligated to read

---

[49] *Id.*
[50] *Id.*
[51] *Id.* at p. 8.
[52] Rec. Doc. 104 at p. 1.
[53] *Id.*
[54] *Id.* at p. 2 (citing *Brown v. Phoenix Life Ins. Co.*, 843 F. App'x. 533 (5th Cir. 2021); *Allstate Life Ins. Co. v. Marcelle*, 2024 WL 1999548 (M.D. La. May 6, 2024)).

the policy when received.[55] Hargrove is not a named party to this litigation.[56] Regardless, State Farm contends that any action against Hargrove is time-barred under the one-year peremptive period to sue an agent under La. R.S. 9:5606.[57]

Doucet-Speer responds that it does not seek to establish claims against Hargrove, extend coverage, or be granted additional rights under the Policy.[58] Instead, Doucet-Speer contends it demonstrates that partial summary judgment is appropriate because "the subjective position of Jeffery Speer . . . is not merely self-serving . . . [but] is supported by [Hargrove] and is a material fact for trial."[59] Doucet-Speer claims State Farm offers no evidence to refute the subjective beliefs held by Speer.[60]

Doucet-Speer appears to ask the Court to make a finding *in fact* of Speer's subjective belief as to coverage, perhaps as an end around a detrimental reliance claim.[61] However, on a motion for summary judgment, courts may not evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes.[62] Because a party's state

---

[55] *Id.* (citing *Isadore Newman Sch. v. J. Everett Eaves, Inc.*, 42 So.3d 352 (La. 2010)).

[56] Rec. Doc. 104 at p. 1. Here, State Farm dedicates argument to whether Doucet-Speer states a viable claim against Hargrove. Rec. Doc. 104 at pp. 10-20. Presumably, this is addressing the essence of Doucet-Speer's assertions in its motion that Speer relied on Hargrove's representations as to coverage for the alleged losses. However, Hargrove is not a named party, and Plaintiffs do not assert claims against Hargrove for detrimental reliance or for failure to procure insurance coverage. Rec. Docs. 41, 108. Thus, the Court need not address any hypothetical claims as to Hargrove.

[57] Rec. Doc. 104 at p. 2.

[58] Rec. Doc. 108 at p. 2.

[59] *Id.*

[60] *Id.*

[61] Although Doucet-Speer attempts to distinguish their motion as a motion seeking summary judgment as to the subjective belief of Speer versus a finding of detrimental reliance as a matter of law, it offers no caselaw supporting a basis for such finding. Summary judgment is "particularly inappropriate" when questions of subjective belief, motive, and intent are at stake. *Friedman v. Meyers*, 482 F. 2d 435, 439 (2d Cir. 1973); *see also Deneau v. Amtel, Inc.*, No. 77 CIV. 5718, 1980 WL 1440, at *9 (S.D.N.Y. Sept. 22, 1980) (finding where issues were raised as to the state of mind, intent and knowledge of the parties, summary judgment is inappropriate where it is sought on the basis of the inferences which the parties seek to have drawn questions of motive, intent, and subjective feelings and reactions).

[62] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

of mind is inherently a question of fact which turns on credibility, it is generally inappropriate to grant summary judgment.[63]

As the Louisiana Supreme Court has explained, "the only duty imposed on the [insurance] agent is to obtain the coverage requested by the customer."[64] "To establish a detrimental reliance claim under Louisiana Civil Code art. 1967, a plaintiff must prove (1) a representation by word or conduct, (2) justifiable reliance, and (3) a change in position to one's detriment resulting from the reliance."[65] "Typically, whether a plaintiff justifiably relied on a promise is a fact question, but a plaintiff's reliance on a promise may be unreasonable as a matter of law."[66] "A party cannot reasonably rely on an employee's representations when it 'conflict[s] with the clear meaning of the contract terms.'"[67]

Doucet-Speer has not presented the Court with summary judgment evidence establishing that there are no genuine disputes of material fact as to coverage. The Court finds that Speer cannot reasonably rely on Hargrove's alleged conflicting statements as a matter of law.[68] Reliance on oral representations is unreasonable because "insurance contracts must be in writing."[69] "Louisiana law holds an insured responsible for reading and knowing the provisions of their own insurance policy."[70]

---

[63] *Waste Mgmt. of Louisiana, L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019).

[64] *Coleman E. Adler & Sons, L.L.C. v. Axis Surplus Ins. Co.*, 49 F.4th 894, 899 (5th Cir. 2022) (citation omitted).

[65] *Allstate Life Ins. Co. v. Marcelle*, No. 24-30349, 2025 WL 789551, at *3 (5th Cir. Mar. 12, 2025) (citing *Patriot Const. & Equipment, LLC v. Rage Logistics, LLC*, 15-1136, p. 10 (La. App. 3 Cir. 4/6/16), 215 So.3d 844, 852; La. Civ. Code Ann. art. 1967)).

[66] *Id.* (citing *Drs. Bethea, Moustoukas & Weaver LLC v. St. Paul Guardian Ins. Co.*, 376 F.3d 399, 403 (5th Cir. 2004)).

[67] *Id.* (quoting *Cenac v. Orkin, L.L.C.*, 941 F.3d 182, 198–99 (5th Cir. 2019) (citing *Bethea*, 376 at 404–05); *see also Brown v. Phoenix Life Ins. Co.*, 843 F. App'x 533, 545–46 (5th Cir. 2021) (finding reliance on oral representations unreasonable because "insurance contracts must be in writing").

[68] *Allstate Life Ins. Co.*, 2025 WL 789551, at *3.

[69] *Id.* (citing *Brown v. Phoenix Life Ins. Co.*, 843 F. App'x 533, 545-46 (5th Cir. 2021)).

[70] *Id.* at n.4 (citing *Motors Ins. Co. v. Bud's Boat Rental, Inc.*, 917 F.2d 199, 205 (5th Cir. 1990)).

In the Court's view, Doucet-Speer does not argue that it sought coverage that Hargrove failed to procure; rather, Doucet-Speer contends the testimony shows that, contemporaneous with submitting the Sworn Proof of Loss to State Farm, Speer discussed with Hargrove whether the Policy provided coverage for these types of losses.[71] The record demonstrates that this alleged conversation occurred after coverage had already been procured and after the loss was sustained.[72]  The deposition testimony shows that, in a phone call to Hargrove, Speer posed a hypothetical to Hargrove regarding employees stealing money and whether there was coverage.[73] Hargrove testified that he remembered "seeing the employee dishonesty kind of coverage" and "telling [Speer] something, like, "Yeah, you know, you would – you would have coverage for that."[74] Hargrove also testified that at some point he remembered Speer asking if he had the two-million dollar aggregate CGL, but he did not remember specifically saying that the employee dishonesty endorsement "is going to go from ten thousand all the way up to, you know, whatever."[75] Hargrove testified that, if he was asked by Speer the amount of coverage as it is listed in the declarations, then "yes. . . at some point we discussed, like,

---

[71] Rec. Doc. 95-3 at pp. 7-9.
[72] In a Southern District of Ohio case, the district court observed that on a negligent misrepresentation claim on a post-loss coverage opinion from an agent, an insured "cannot prove reliance or damages" based on representations "made after the fact of the purchases" of a personal liability protection policy.  *See Abboud v. LM General Insurance Company*, 2018 WL 4095952, at *4 (N.D. Ohio Aug. 29, 2018) (citing *Mafcote, Inc. v. Genatt Associates, Inc.*, 2017 WL 537870, at *10 (S.D. Ohio Feb. 14, 2007)); *see also PSG-Mid Cities Med. Ctr., LLC v. Jarrell*, No. 3:20-CV-02477-E, 2020 WL 7398782, at *3 (N.D. Tex. Dec. 17, 2020) (quoting *W. Texas Agriplex v. Mid-Continent Cas. Co.*, No. 5:03-CV-199-C, 2004 WL 1515122, at *13 (N.D. Tex. July 7, 2004) ("[A]n insured normally cannot bring a misrepresentation claim for any alleged representations made after a loss.").
[73] Rec. Doc. 95-3 at p. 7. (citing 95-6 at pp. 30-31).
[74] *Id.*
[75] Rec. Doc. 95-6 at pp. 45-46.

hey, do I have the one million, two million aggregate, you know, yes."[76] Hargrove did not recall ever discussing coverage in Speer's office.[77]

This conflicting evidence demonstrates that genuine fact issues exist both as to coverage and policy limits for the losses sustained. The Policy's Declarations Page contains a $10,000 limit for Employee Dishonesty.[78] The parties' written stipulation confirms this Policy "contains the same and identical provisions, Sections of Coverage, limits, endorsements, exclusions, etc. for the years 2014-2019."[79] It is also evident that the Employee Dishonesty $10,000 limit is listed under "Section I – Property" coverage and the $2 million aggregate limits is listed under "Section II – Liability" coverage on the declarations page.[80]

Even if the Court found that Hargrove made oral representations to Speer regarding coverage and policy limits, it would still be unreasonable for Plaintiffs to have reasonably relied on this post-loss oral representation under applicable law.[81] The statements at issue – which occurred post-procurement and post-loss – do not establish that no genuine issue of material fact exists as to coverage because Doucet-Speer, through Speer, is generally responsible for reading its policies and is expected to know the provisions.[82]

---

[76] Rec. Doc. 95-3 at p. 8 (citing Rec. Doc. 95-6 at pp.68-69).
[77] Rec. Doc. 95-6 at p. 45.
[78] Rec. Docs. 92, 97-4 at p. 7.
[79] Rec. Doc. 92.
[80] Rec. Doc. 97-4 at pp. 7-8.
[81] *Allstate Life Ins. Co. v. Marcelle*, 2025 WL 789551, at *3 (5th Cir. Mar. 12, 2025).
[82] *Allstate Life Ins. Co. v. Marcelle*, No. 21-CV-469-SDD-SDJ, 2024 WL 1999548, at *5 (M.D. La. May 6, 2024), *aff'd*, No. 24-30349, 2025 WL 789551 (5th Cir. Mar. 12, 2025).

Further, the generalized testimony of a party's subjective belief does not create an issue for trial when, as here, the beliefs are not substantiated.[83] "While a witness is indeed capable of attesting to their own personal experiences and feelings, such testimony cannot create genuine issues of material fact based on subjective opinions and recitation of legal conclusions. General conclusory allegations do not become adequate summary judgment evidence simply because they are put in affidavit form."[84] Speer's subjective belief is not supported by undisputed facts, and Speer's subjective belief alone does not support summary judgment in Plaintiffs' favor. Thus, Doucet-Speer's Motion for Partial Summary Judgment[85] is denied.

### C.    State Farm's Motion for Summary Judgment

State Farm paid the $10,000 policy limits under the Employee Dishonesty endorsement issued to Doucet-Speer. It argues that no additional amounts are owed under the policy.[86] State Farm seeks summary judgment and dismissal with prejudice of all claims by Plaintiffs against State Farm for additional amounts owed under the Policy, the claims for penalties and attorney's fees under La. R.S. 22:1892 and La. R.S. 22:1973, the claims for mental anguish damages by Doucet-Speer, and all claims individually asserted by Speer.[87] Doucet-Speer opposed this motion,[88] but Speer did not.

---

[83] *Lewis v. Eye Care Surgery Ctr., Inc.*, No. CV 21-475-SDD-RLB, 2023 WL 8880348, at *3 (M.D. La. Dec. 22, 2023) (citing *Bickerstaff v. Whitney Natl. Bank*, No. 96-30231, 1996 WL 595654, at *3 (5th Cir. Sept. 20, 1996); *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 654 (5th Cir. 2004); *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 152-53 (5th Cir. 1995)).

[84] *Scott v. Brandon Co. of Tennessee, LLC*, No. CA 23-697-SDD-SDJ, 2025 WL 852504, at *6 (M.D. La. Mar. 18, 2025).

[85] Rec. Doc. 95.

[86] Rec. Doc. 97-2 at p. 1.

[87] Rec. Doc. 97 at p. 2.

[88] Rec. Doc. 103.

Accordingly, State Farm's Motion for Summary Judgment as to Speer is granted as unopposed.

Doucet-Speer admits to each uncontested material fact submitted by State Farm.[89] Thus, the following facts are undisputed.

State Farm issued Commercial Policy, #980BM-G174-4 to Doucet-Speer for the policy period February 14, 2018 to February 14, 2019.[90] As stipulated by the parties, the Policy was in effect for years 2014 to 2019 and contained the same provisions, sections of coverage, limits, endorsements, and exclusions for the years 2014 through 2019 as contained in the policy issued for the policy period February 14, 2018 to February 14, 2019.[91] The named insured on the policy is Doucet-Speer, A Professional Law Corporation Entity: Corporation.[92] The policy contains endorsement CMP-4710 for Employee Dishonesty.[93] In the declarations page of the policy under Section 1 – Extension of Coverage – Limit of Insurance – Per Policy for Employee Dishonesty Coverage, the Limit of Insurance is listed as $10,000.[94] State Farm paid Doucet-Speer the $10,000 limit for the claim filed under the policy that is the subject of this lawsuit.[95]

### 1. Ambiguities in the interpretation of the Policy must be construed in favor of the insured – here, Doucet-Speer.

Under Louisiana law, "an insurance policy is a contract that must be construed in accordance with the general rules of interpretation of contracts set forth in the Louisiana

---

[89] Rec. Doc. 103-1. Doucet-Speer contends that despite admitting to all uncontested facts, that "there are too many other issues that have not been presented to the Court" and summary judgment should not be granted. Rec. Doc. 103-1 at p. 1.
[90] Rec. Docs. 97-3 at p. 1 (citing Rec. Docs. 97-4, 92), 103-1.
[91] Rec. Docs. 97-3 at p. 1 (citing Rec. Doc. 97-4), 103-1.
[92] Id.
[93] Rec. Docs. 97-3 at p. 1 (citing Rec. Doc. 97-4 at pp. 45-46), 103-1.
[94] Rec. Docs. 97-3 at p. 2 (citing Rec. Doc. 97-4 at p. 7), 103-1.
[95] Rec. Docs. 97-3 at p. 2 (citing Rec. Doc. 97-5 at p. 14), 103-1.

Civil Code."[96] The court's role "in interpreting insurance contracts is to ascertain the common intent of the parties to the contract."[97] The Civil Code provides that "[t]he words of a contract must be given their generally prevailing meaning," and "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[98] Each provision of the insurance contract "must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."[99] Louisiana law also requires that an insurance policy "should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion."

"With respect to coverage, the insured bears the burden of proving that the incident giving rise to a claim falls within the policy's terms."[100] However, "the insurer bears the burden of proving the applicability of an exclusionary clause within the policy."[101] "Exclusionary provisions must be read together with the entire policy, and are construed strictly against the insurer and in favor of coverage."[102] "Any ambiguities within an exclusionary provision or the policy as a whole must be construed against the insurer and

---

[96] *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 262 (5th Cir. 2003).
[97] *Mayo v. State Farm Mut. Auto. Ins. Co.*, 2003-1801 (La. 2/25/04), 869 So.2d 96, 99.
[98] La. C.C. Arts. 2046, 2047, 2050.
[99] *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 763 n.8 (La. 1994) (citing La. Civ. Code art. 2050).
[100] *Coleman v. Sch. Bd. of Richland Par.*, 418 F.3d 511, 517 (5th Cir. 2005) (citing *Doerr v. Mobil Oil Corp.*, 2000-0947 (La. 12/19/00), 774 So.2d 119, 124).
[101] *Id.*
[102] *Coleman*, 418 F.3d at 517 (citing *Garcia v. Saint Bernard Parish Sch. Bd.*, 576 So.2d 975, 976 (La. 1991) & *Vallier v. Oilfield Constr. Co.*, 483 So.2d 212, 215 (La. Ct. App. 1986)).

in favor of coverage."[103] When the "language of an insurance policy is clear, courts lack the authority to change or alter its terms under the guise of interpretation."[104]

"An insurer, like other individuals, is entitled to limit its liability and to impose and enforce reasonable conditions upon the policy obligations it contractually assumes; it may change or amend the coverage provided by the policy by an endorsement attached to the policy as long as the provisions and/or endorsements do not conflict with statutory law or public policy."[105] When an endorsement is attached to the policy, the endorsement becomes part of the contract.[106] The policy and the endorsement must be construed together.[107] "If a conflict between the endorsement and the policy exists, the endorsement prevails."[108]  Standard exclusions may be completely eliminated or modified in part by an endorsement.[109]

### a. Employee Dishonesty Endorsement

Here, the Policy had an extension of coverage under the CMP 4170 Employee Dishonesty Endorsement, which was an Extension of the Section I Property Coverage, that provided State Farm "will pay for direct physical loss to *Business Personal Property and "money" and securities* . . . resulting from dishonest acts committed by any of your 'employees' acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:

a. Cause you to sustain loss; and

---

[103] *Coleman*, 418 F.3d at 517 (citing La. C.C. Art. 2056; *Mayo*, 869 So.2d at 100; *Reynolds v. Select Properties, Ltd.*, 634 So.2d 1180, 1183 (La. 1994); *La. Ins. Guar. Ass'n*, 630 So.2d at 767; *RPM Pizza, Inc. v. Auto. Cas. Ins. Co.*, 601 So.2d 1366, 1369 (La. 1992)).
[104] *Coleman*, 418 F.2d at 518 (citing *La. Ins. Guar. Ass'n*, 630 So.2d at 764).
[105] *King v. Old Republic Ins. Co.*, 2016-0170 (La. App. 4 Cir. 9/7/16), *4, 200 So.3d 989.
[106] *Id.*
[107] *Id.*
[108] *Id.* at *7.
[109] *See* 15 La. Civ. L. Treatise, Insurance Law & Practice § 6:11 (4th ed.).

b. Obtain financial benefit (other than salaries, commission, fees, bonuses, promotions, awards, profit sharing, pension or other 'employee' benefits earned in the normal course of employment for:

(1) Any 'employee' or
(2) Any other person or organization intended by that 'employee' to receive that benefit."[110]

The Policy states that "[t]he most we will pay for loss under this Coverage in any one occurrence . . . is the Limit of Insurance for Employee Dishonesty shown in the Declarations, *even if the occurrence includes more than one policy period*."[111] The limit of coverage under the Employee Dishonesty Endorsement is clearly and unambiguously identified at a limit of $10,000 on the Declarations Page, Section I Extensions of Coverage Limit of Insurance – Per Policy.[112]

The Employee Dishonesty Endorsement is provided under Section I – Property Coverage, Extension of Coverage.[113] The endorsement provides limits on types of coverages including Dependent Property – Loss of Income at $5,000 and Employee Dishonesty at $10,000.[114]

The Policy defines loss as follows:

4. All loss:

a. Caused by one or more persons; or

b. Involving a single act or series of acts;

is considered one occurrence.[115]

---

[110] Rec. Doc. 97-2 at pp. 4-5 (citing Rec. Doc. 97-4 at pp. 45-46).
[111] Rec. Doc. 97-4 at p. 45 (emphasis added).
[112] *Id.* at p. 7.
[113] *Id.* at p. 45.
[114] *Id.*
[115] *Id.*

As to the Employee Dishonesty Endorsement, it is undisputed that the endorsement applies, but the parties dispute the amount of coverage. Doucet-Speer alleges State Farm denied the claim except for payment under the Employee Dishonesty Endorsement in the amount of $10,000.[116] Doucet-Speer disputes that is the limit of coverage.[117] Doucet-Speer argues additional provisions under the Policy apply; thus, it seeks additional damages and penalties.

Plaintiffs' Amended Complaint alleges that, in the summer of 2019, Speer was unable to get satisfactory statements from his bookkeeper and office manager about the financial state of affairs of his law practice.[118] Once he discovered substantial amounts of missing money from both his Operating and Trust accounts, he terminated his bookkeeper, office managers, and all employees involved.[119] Speer determined that several workers were taking money in reimbursements for expenses that didn't exist by manipulating Quickbooks.[120] Speer also confronted his office manager about some of the checks signed with her name, which she verified were forgeries.[121] The Amended Complaint contains no other factual allegations identifying the employees or concerning the acts of theft or embezzlement resulting in the alleged losses.

State Farm cites Speer's testimony that the alleged thefts were committed by the firm's employees through multiple transactions run through the firm's operating account, law firm trust account, and credit line for loans on certain cases which totals over $2

---

[116] Rec. Doc. 41 at p. 4.
[117] Rec. Doc. 97-2 at pp. 7-8.
[118] Rec. Doc. 41 at p. 3.
[119] *Id.*
[120] *Id.*
[121] *Id.*

million.[122] Speer testified that theft by employees began on a large scale in 2017 when he began having serious health issues.[123]

Speer employed Michelle Mouton ("Mouton") as his office manager, Gypsy Delahoussaye ("Delahoussaye") as a bookkeeper/paralegal, and Carla Toucheck ("Toucheck") as a bookkeeper.[124] Speer testified that he found a firm check in the amount of $38,500.00 written by Mouton to herself, which she cashed and deposited into her personal bank account.[125] Speer also testified he had given Mouton signature rights on the firm's operating bank account to cover things like payroll, the electric bill, or operating expenses when he was not available.[126] Speer stated he was in a jury trial at the time she cashed the check.[127]

Speer also discovered that, in personal injury cases, his "office manager and cohort" would take checks signed for payment of medical providers at the time of settlement, never disburse the funds, and write separate checks on the side.[128] Speer testified that Quickbooks would show that the expenses were paid.[129] In the first instance of theft regarding a personal injury client's case, Speer determined he still owed the medical providers $115,000.[130]

Speer asserts that further review of the law firm's financial records in 2019 revealed that Toucheck, the bookkeeper, was collecting regular payroll checks and then

---

[122] Rec. Doc. 97-2 at p. 13 (citing Rec. Doc. 97-5 at pp. 26-27).
[123] Rec. Doc. 97-5 at pp. 19-20.
[124] *Id.* at pp. 20-21.
[125] *Id.* at pp. 24-25.
[126] *Id.* at p. 26.
[127] *Id.* at p. 27.
[128] *Id.* at pp. 27-29.
[129] *Id.* at p. 28.
[130] Rec. Doc. 97-5 at pp. 28-29.

taking checks on the side as an independent contractor.[131] He claimed multiple employees were doing the same.[132] Speer retained a forensic accounting firm to perform a forensic analysis of his accounts some time in 2022 or 2023.[133] He could not recall if he provided that report to State Farm.[134]

Speer testified that Mouton, Toucheck, and Delahoussaye all participated in the thefts, along with Toucheck's fiancé Rowdy Whittington ("Whittington").[135] Speer testified that Whittington was employed as a runner for the firm and was receiving checks that were cashed.[136] Speer testified of another theft in which Delahoussaye's daughter received a check which she used to buy a car.[137] However, he testified Delahoussaye was dead by then, and he did not know of any involvement by her.[138]

Speer also testified that he had a client line he used for personal injury cases.[139] After terminating Mouton, he found out she created another trust account and found checks that she had signed or borrowed money, ran it through the trust account, and took it out and put it into her personal account.[140]

Speer stated that after he terminated Mouton, he found checks on which she had signed and forged his signature and deposited the checks in his trust account.[141] Speer discovered that she had been borrowing money against the firm's credit line for herself.[142]

---

[131] *Id.* at pp. 29-30.
[132] *Id.* at pp. 29-31.
[133] *Id.* at pp. 35-36.
[134] *Id.* at p. 37.
[135] *Id.* at 39.
[136] *Id.* at pp. 38-39.
[137] *Id.* at p. 40.
[138] *Id.* at p. 41.
[139] *Id.* at pp. 42-43.
[140] Rec. Doc. 97-5 at pp. 42-43.
[141] *Id.* at pp. 46-47.
[142] *Id.*

Speer testified that the president of the bank, Jeremy Callais, later altered the documents and copy and pasted Speer's signature over the forged signatures before sending a copy of the loan to the police.[143]

Speer also stated that Toucheck was writing her son checks, but he did not know how much, and he wasn't clear on the details because the firm also had a client case open for him.[144] Speer believed she was paying her son "in excess of what he had coming."[145] Speer also found a check signed by Toucheck that came out of the trust account.[146]

Speer further admitted that he was investigated by the Louisiana Bar Association for a check in the amount of $10,000 that Toucheck bounced.[147] Speer claims that the father in a client's case was in need of funds and he attempted to provide a loan to him but, but Toucheck gave Speer the wrong check.[148] Speer acknowledged that the check he signed was from the trust account, and he should not have signed it.[149]

Speer testified that both Mouton and Toucheck endorsed the $38,500 check.[150] Contrary to his previous testimony, Speer testified that Toucheck took it to the bank, and he found a bank statement showing she made a $36,000 cash deposit into her account.[151] However, the record evidence reflects that Mouton was the one who made the cash deposit.[152] Speer then testified he had no doubt they were all in cahoots.[153] But, he later

---

[143] *Id.* at p. 47.
[144] *Id.* at p. 52.
[145] *Id.*
[146] *Id.*
[147] *Id.* at p. 55.
[148] *Id.*
[149] *Id.*
[150] Rec. Doc. 97-5 at p. 59.
[151] *Id.* at p. 60.
[152] Rec. Doc. 103-4 at p. 28.
[153] Rec. Doc. 97-5 at p. 60.

recanted whether Delahoussaye or her daughter had any knowledge.[154] Speer further testified there were about 31 loans on his account, with the largest one to Mouton's uncle.[155]

State Farm contends that, although the theft and embezzlement consisted of a series of acts, it still constitutes a single occurrence under the terms of the Policy;[156] thus, coverage is limited to $10,000.[157] It is undisputed that this $10,000 limit was paid by State Farm to Doucet-Speer.[158] Speer testified that he submitted a proof of claim form to State Farm in February 2020.[159] He also testified he recalled receiving the payment, but due to his memory issues he could not recall when.[160]

Doucet-Speer argues that it sustained losses over the course of multiple policy periods and that each act and event causing the losses sustained was separate and distinct from the others.[161] Doucet-Speer argues "Occurrence" is defined in the Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[162] However, Doucet-Speer pulls this definition from the Definitions in "Section II" of the Policy which is the Business Liability Coverage section.[163] It cannot be found in the Section I Property Coverages.[164] Section II provides third-party insurance to protect the insured – here, Doucet-Speer – from losses resulting from actual or potential

---

[154] *Id.* at p. 61.
[155] *Id.* at p. 86.
[156] Rec. Doc. 97-2 at p. 15.
[157] *Id.* at p. 16.
[158] Rec. Docs. 97-3 at p. 2 (citing Rec. Doc. 97-5 at p. 14), 103-1.
[159] Rec. Doc. 97-2 at p. 9 (citing Rec. Doc. 97-5 at p. 94).
[160] *Id.* (citing Rec. Doc. 97-5 at pp. 97-98).
[161] Rec. Doc. 103 at p. 11.
[162] *Id.* at p. 12 (citing Rec. Doc. 103-3 at p. 93).
[163] Rec. Doc. 103-3 at p. 80.
[164] *Id.* at p. 58.

liability to a third party, whereas Section I provides first-party insurance to protect Doucet-Speer from its own actual losses and expenses.[165]

Doucet-Speer makes a first-party claim for its property losses. The coverage provisions referenced by Doucet-Speer throughout its briefing are contained in Section II or the third-party liability coverage provisions of the Policy, not Section I's first-party property coverage. Speer testified that this is a first-party claim for lack of good faith and fair dealing.[166] Doucet-Speer improperly seeks to utilize third-party liability coverage provisions to support its first-party property damage claim.[167]

Doucet-Speer contends the Policy is silent as to how many occurrences are allowable per the Policy period or over the multiple years the Policy was in effect.[168] Doucet-Speer notes that its forensic accountant Kyle P. Saltzman ("Saltzman"), CPA, CFE, detailed in his report that for over five years, there were multiple events involving at least three employees of Doucet-Speer which caused and contributed to the losses.[169] Doucet-Speer posits that the events are multiple occurrences that happened during different policy periods, not a single act.[170] Doucet-Speer argues that, if the Court finds that the only applicable Endorsement is CMP-4710 pertaining to Employee Dishonesty, the amount due is not capped at $10,000, and the tender is not dispositive of this case.[171]

---

[165] Property insurance is considered "first-party" insurance in the sense that it covers a loss sustained by the insured, the first party to the insurance contract. Conversely, liability or "third-party" insurance covers the insured's liability to a third party (a non-party to the insurance contract) for that party's loss. *Mangerchine v. Reaves*, 2010-1052 (La. App. 1st Cir. 3/25/11), 63 So.3d 1049, 1055 n.4 (citing Black's Law Dictionary (8th ed. 2004)).

[166] Rec. Doc. 97-5 at pp. 76-77.

[167] Louisiana courts have consistently held that CGL policies are intended to protect the insured from losses caused to third parties, not to cover the insured's own losses. *See e.g. All Crane Rental of Georgia, Inc. v. Vincent*, 47 So. 3d 1024 (La. App. 1 Cir. Sep. 10, 2010).

[168] Rec. Doc. 103 at p. 12.

[169] *Id.* at. p. 12.

[170] *Id.* at p. 13.

[171] *Id.* at p. 14.

Saltzman reviewed a haphazard sampling of 15 checks made payable to Mouton, Toucheck, or Cash in Quickbooks, and he noted in his Report that Mouton received checks totaling $81,515.18 which were recorded in a similar way to that of clients of Doucet-Speer.[172] Mouton was never a client.[173] Saltzman noted various amounts which he considered in excess of what would be traditionally expected in a law practice.[174] For example, he noted substantial cash distributions to Mouton for items such as: (1) Auto Allowances; (2) client expenses; (3) office expenses; (4) gifts; (5) coded as "Michelle M;" (6) "Due from Shareholder"; (7) medical reimbursement; (8) various "other;" (9) maintenance; and (1) reimbursed expenses.[175]

Saltzman also noted substantial cash distributions to Toucheck, including: (1) Auto Allowance; (2) coded as "Michelle M;" (3) coded as "Cullen Hatten"; (4) coded as "Theft;" (5) gifts; (6) maintenance and (7) reimbursed expenses.[176] As for Whittington, a runner, Saltzman noted substantial cash distributions such as (1) split/mix; (2) lawn maintenance; (3) maintenance; and (4) reimbursed expenses.[177]

He observed $423,119 in checks to have been made payable to "Cash."[178] It is unclear how the cash distributions related to the employees, either as individuals or together in a scheme. Distributions were listed as: (1) Due from Shareholder; (2) reimbursed expenses; (3) maintenance; (4) contract labor; (5) utilities; (6) telephone; and

---

[172] Rec. Doc. 103-4 at p. 4.
[173] *Id.*
[174] *Id.*
[175] *Id.*
[176] Rec. Doc. 103-4 at p. 5.
[177] *Id.*
[178] *Id.* Speer acknowledged that some checks made payable to Cash were for his incidental living expenses or other minimal expenses, which he claimed was an infrequent practice or should have amounted to no more than $500 per month. Rec. Doc. 103-4 at p. 17.

(7) various other.[179] Saltzman, relying on representations by Speer, estimated potential fraudulent cash disbursements to be between $600,000 and $665,000.[180] He opined that the large volume of checks made payable to Cash, and the larger than expected checks to administrative staff for reimbursable expenses, do not by themselves prove fraud, but bear similar traits to other engagements in fraud.[181]

Saltzman supplemented his report after being provided additional financial documentation for review. He determined that 743 of 843 checks were made payable to either Mouton, Toucheck, Whittington, or Cash, representing approximately $1,085,682.[182] In an addendum to his supplemental report, Saltzman identified that the $38,500 check created from the firm's operating account was made payable to Mouton, signed by Mouton, and recorded as a loan receivable/client receivable.[183] On this particular transaction, Toucheck was a second endorser on the check.[184] Mouton then made a deposit of $36,000 of cash to her personal account.[185] Saltzman also noted that various electronic credit card payments were made from Mouton's personal bank account the following day.[186] Saltzman noted another instance in which a $9,000 check was created from the firm's operating account and made payable to Mouton, recorded as a loan receivable/client receivable, and endorsed by Mouton and Toucheck.[187] Mouton

---

[179] *Id.* at p.6.
[180] *Id.*
[181] *Id.* at p. 7.
[182] *Id.* at p. 14.
[183] Rec. Doc. 103-4 at pp. 27-28.
[184] *Id.*
[185] *Id.*
[186] *Id.*
[187] *Id.* at p. 29.

deposited $8,000 of cash to her personal account the following day, and a day later issued a personal check in the amount of $7,500 for a "Pool Deposit."[188]

Saltzman found that certain transactions and distributions created suspicion of their legitimacy, but he stated that he was not engaged to, and did not, express an opinion relative to the subject matter.[189] Saltzman was retained for the purpose of identifying and estimating Doucet-Speer's losses.[190] He stated he was not in a position to opine as to fraud or intentional acts.[191]

State Farm's retained forensic accounting expert, Tuan Pham ("Pham"), opined that Saltzman's report was methodologically flawed and lacking support, speculative and unreliable, and overstated his estimate of losses.[192] Even so, it appears both experts were working with limited documentation.[193]

Pham noted that Saltzman failed to address formal charges brought by the Office of Disciplinary Counsel ("ODC") against Speer and relevant data therein.[194] Pham stated that the ODC's 2017 investigation and audit noted the following findings: (1) disbursements from the trust account had no identifying corresponding deposits and/or balances available for specific client matters; (2) allocations to Speer for cost reimbursement in excess of costs identified as advanced on behalf of the same matter; (3) duplicate withholdings from settlement proceeds for the same obligations; (4) failure to return cost reduction refunds to respective clients; (5) balances withheld from client

---

[188] *Id.*
[189] *Id.* at p. 30.
[190] *Id.* at pp. 6-7.
[191] *Id.* at p. 7.
[192] Rec. Doc. 103-2 at p. 3.
[193] *Id.* at pp. 3-4.
[194] *Id.* at p. 8.

proceeds for medical providers were paid to Speer; and (6) excessive time periods between receipt of client money and issued payments to the client/third parties due.[195]

Pham stated the ODC Report concluded that Speer forged a client's signature to obtain a settlement check and mismanaged his trust account, including the issuance of numerous checks personally signed by Mouton, a nonlawyer.[196] Pham observed that the ODC concluded that Speer misused his client trust account, which held insufficient funds to honor the sum of all client and third-party money received, outstanding checks, and pending interest, to a shortfall of over $800,000.[197]

Pham opined that Saltzman's forensic accounting analysis was impacted by his failure to account for the ODC accusations of fraud, financial mismanagement, and poor record keeping against Speer.[198] Pham also observed that Saltzman relied upon information and representations provided by Speer and did not account for, or reference, any agreed upon salary for Toucheck or Whittington, and he disregarded documentation of Speer's regular practice of paying bonuses to Mouton and others.[199] Pham referenced various text message exchanges wherein Speer directed Toucheck or other staff to issue bonus checks "asap" on multiple occasions to staff.[200] Pham also pointed to various text message exchanges that Saltzman did not account for showing that there was money from Mouton and Toucheck spent for Speer's personal benefit that was reimbursable.[201] Pham opined that Saltzman failed to account for numerous examples of checks made to

---

[195] *Id.*
[196] *Id.*
[197] *Id.* at pp. 8-9.
[198] *Id.* at p. 9.
[199] *Id.* at pp. 12-13.
[200] *Id.* at p. 14.
[201] *Id.* at p. 15.

"Cash" for Speer's benefit or at his behest.[202] Pham also pointed to instances of Speer instructing Mouton or Toucheck to "forge" his signature, which Saltzman failed to address.[203] Pham opined that there was no indicia of the alleged fraud or that economic loss was incurred, supported by the limited accounting records produced by Plaintiff to date.[204]

State Farm relies on case law and the policy language to support its assertion that the $10,000 tender satisfies its obligations under the Policy. State Farm contends that the multiple acts of theft and embezzlement constitute "one occurrence" under the Policy.[205] In *Jefferson Parish Clerk of Court Health Ins. Trust Fund v. Fid. & Deposit Co. of Md.*,[206] the trustee of a health insurance trust fund withheld multiple employee contributions but failed to pay the premiums to the trust fund, using the withheld money to provide funds to operate his office and pay non-insurance related expenses.[207]

There, the language of the trust fund's Commercial Crime Policy was nearly identical to the one at issue, providing "Occurrence means all loss caused by, or involving, one or more 'employees,' whether the result of a single act or series of acts."[208] The court found that the language was inclusive of any scheme to cause loss to the insured; therefore, only one occurrence of employee dishonesty could be found under that definition.[209] The trustee's multiple acts of embezzlement were found to be integral parts of a scheme to deprive the trust fund of its current premiums directed to the single aim of

---

[202] *Id.* at pp. 16-19.
[203] *Id.* at p. 21.
[204] *Id.* at 23.
[205] Rec. Doc. 97-2 at pp. 13-16.
[206] 673 So. 2d 1238 (La. App. 5 Cir. Apr. 30, 1996).
[207] *Jefferson Parish Clerk of Court Health Ins. Trust Fund v. Fid. & Deposit Co. of Md.*, 95-951 (La. App. 5 Cir. Apr. 30, 1996), 673 So. 2d 1238, 1245.
[208] *Id.*
[209] *Id.*

providing the trustee with additional funds to operate his office and pay non-insurance expenditures.[210] Utilizing the "cause" theory, the court observed that the trustee's acts were one occurrence.[211]

Doucet-Speer distinguishes *Jefferson* because it contends the Policy here defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[212] However, Doucet-Speer cites to the definition of "occurrence" in the Section II Definitions under the Section II Liability Limits of Insurance, arguing the Policy does not differentiate one act versus a series of acts.[213] Yet, the Policy defines "occurrence" as described hereinabove under CMP-4170 Employee Dishonesty Endorsement.[214] Doucet-Speer concedes that the *Jefferson* court was correct in considering multiple acts of embezzlement as one occurrence under the policy limit where the definition there expressly stated that "all loss [is a] single act or a series of acts."[215] But Doucet-Speer claims that is not the case here. Doucet-Speer also claims that the term "loss" is not mentioned in the Policy's definition of occurrence.[216] However, again, Doucet-Speer fails to address the terms of CMP 4710 Employee Dishonesty Endorsement which define "loss" as "[c]aused my one or more persons; or involving a single act or series of acts; is considered one occurrence" – a nearly identical definition as the policy in *Jefferson.*[217]

---

[210] *Id.*
[211] *Id.*
[212] Rec. Doc. 103 at p. 5 (citing Rec. Doc. 103-3 at p. 93).
[213] *Id.*
[214] Rec. Doc. 103-3 at p. 45.
[215] Rec. Doc. 103 at p. 5.
[216] *Id.* at p. 5.
[217] Rec. Doc. 103-3 at p. 45.

Doucet-Speer further argues that, in that case, there was only one bad actor, whereas here there are at least three separate employees that engaged in multiple independent schemes and tactics over five years.[218] Doucet-Speer asserts that each of the bad actors contributed to a different aspect of the fraud, which was a pattern of multiple dishonest actions over time.[219] Doucet-Speer contends this case is distinguishable from *Jefferson* because the actions here were separate, intentional, ongoing, and involved different individuals.[220]

State Farm asserts that in *Howard, Weil, Labouisse, Friedrichs, Inc. v. Insurance Co. of North America*,[221] a diversity action under Louisiana law, the United States Court of Appeals for the Fifth Circuit found that several fraudulent commodities trades on the employer's account over a four-day period constituted one loss for the purpose of the employee dishonesty coverage's per-loss deductible, as one ongoing episode produced the loss.[222] Doucet-Speer responds that, in *Howard*, the term "occurrence" is not defined, and the court was considering only one bad actor and one action that produced continuing consequences over four days.[223] Doucet-Speer distinguishes *Howard* noting that the case focused on multiple acts versus a single act by one employee, whereas here there are multiple acts involving multiple people producing multiple losses over multiple years.[224]

---

[218] Rec. Doc. 103 at p. 5.
[219] *Id.*
[220] *Id.* at pp. 5-6.
[221] 557 F.2d 1055 (5th Cir. 1977).
[222] Rec. Doc. 97-2 at p. 14.
[223] Rec. Doc. 103 at p. 6.
[224] *Id.*

State Farm cites *APMC Hotel Mgmt., LLC v. Fidelity and Deposit Co. of Maryland*,[225] where the court considered whether three thefts which totaled $804,000 constituted multiple occurrences in determining whether to apply the policy limits of $500,000 per "occurrence."[226] There, the policy defined occurrence as "all loss caused by, or involving, one or more 'employees,' whether the result of a single act or series of acts."[227] In that case, the insured submitted three separate Proofs of Loss for three thefts by one employee over multiple policy periods. The court held the employee's actions constituted "one occurrence" and that the insured's contention that each theft was a separate occurrence was contrary to the language of the policy.[228]

Doucet-Speer responds that the relevant policy in *APMC* defined occurrence as "all loss caused by, or involving, one or more 'employees,' whether the result of a single act or series of acts."[229] Doucet-Speer claims that the State Farm Policy does not define occurrence as "all loss" and that, unlike here, *APMC* involved only one person who committed the same act over and over again.[230]

Doucet-Speer emphasizes, for example, that if Doucet-Speer had sustained losses categorized as: (1) Employee A stole twenty cases of toilet paper and utensils from the kitchen annually; (2) Employee B stole $100,000 money from the trust account annually; and (3) Employee C forged thirty separate $1,000.00 blank checks, which were then deposited into her account, State Farm would treat these as once occurrence, which it disputes.[231]  Doucet-Speer fails to cite or address the relevant policy definition of "loss"

---

[225] 09-2100, 2011 WL 5525966, at *1-2 (D. Nev. Nov. 10, 2011).
[226] Rec. Doc. 97-2 at pp. 14-15.
[227] *Id.* at p. 15 (citing *APMC Hotel Mgmt., LLC*, 2011 WL 5525966, at *3).
[228] *Id.* (citing *APMC Hotel Mgmt., LLC*, 2011 WL 5525966, at *6).
[229] Rec. Doc. 103 at p. 7 (citing *APMC Hotel Mgmt., LLC*, 2011 WL 5525966, at *3).
[230] *Id.* at p. 7.
[231] *Id.* at p. 7.

under the State Farm Employee Dishonesty Endorsement, [232] which defines "loss" as "[a]ll loss . . [c]aused by one or more persons; or [i]nvolving a single act or series of acts; is considered one occurrence."[233]

Regardless, under the relevant terms of the Employee Dishonesty Endorsement, there is merit to Doucet-Speer's argument that case law distinguishes acts by one or more persons involving a single act or series of acts in one scheme as one occurrence versus multiple unrelated schemes by multiple employees as multiple occurrences. Doucet-Speer submitted claims for separate thefts allegedly committed by multiple employees over the course of several policy periods. Doucet-Speer contends that each theft by different employees constitutes a separate occurrence, thereby seeking coverage under the policy limits for each individual act. Although State Farm contends the acts of theft and embezzlement constitute a scheme consisting of a series of acts that remains a single occurrence under the Policy, and some evidence suggests some of the acts may be related schemes, there is still a genuine issue of material fact as to whether all the alleged loss is in fact one "scheme" such that there is only one "occurrence" under the Employee Dishonesty Endorsement.[234]

In a case applying Texas law, *Ran-Nan Inc. v. Gen. Acc. Ins. Co. of Am.*,[235] the Fifth Circuit held that two thefts by two employees working separately and independently constituted two "occurrences" under a store's employee dishonesty insurance policy.[236]

---

[232] Rec. Doc. 97-4 at pp. 45-46.
[233] *Id.* at p. 45.
[234] Rec. Doc. 97-2 at pp. 15-16.
[235] 252 F.3d 738 (5th Cir. 2001).
[236] *Cf. Glaser v. Hartford Cas. Ins. Co.*, 364 F.Supp.2d 529 (D. Md. Apr. 4, 2005) (finding there are two separate "occurrences" of employee dishonesty when two independent causes exist for an insured's total loss due to dishonest acts by two employees who did not conspire to steal from their employer but instead acted independently). This supports the notion that when multiple employees engage in separate acts of theft, each act should be evaluated on its own merits under the policy.

There, as is the case here, the policy defined an "occurrence" as "all loss caused by, or involving, one or more 'employees,' whether the result of a single act or series of acts."[237] The court found that the definition of "occurrence" had two possible interpretations.[238] The Fifth Circuit stated that the more natural reading of the policy is that the "involving" clause, in reference to one or more employees, signifies a group of employees conspiring together to steal.[239] In analyzing the policy language and case law, relying on the "cause" theory, the Fifth Circuit distinguished cases involving a series of thefts by a single employee from those involving independent pilfering schemes by two different employees working separately.[240]

Conversely, in *Madison Materials Co., Inc. v. St. Paul Fire & Marine Ins. Co.*,[241] the Fifth Circuit held that a series of related acts by a single employee was considered a single occurrence. Applying Mississippi law, the court recognized the employee's prolonged 10-year embezzlement scheme consisted of a "series of related acts involving one or more 'employees," as undisputedly meeting the policy definition of occurrence.[242] The court determined that the insured could only recover once for an occurrence even if the occurrence spans several policy periods; thus, the insurer was liable for one policy's limit.[243] However, in that case, there was only one cause of the injury sustained by the insured – a single employee's dishonesty.[244] "As there was but a single cause of [the insured's] injury, and as the policy states that multiple related acts are to be treated as a

---

[237] 252 F.3d at 739.
[238] *See id.* at 739-740.
[239] *Id.*
[240] *Id.* at 740.
[241] 523 F.3d 541 (5th Cir. 2008).
[242] *Madison Materials Co., Inc.*, 523 F.3d at 544. The court also recognized that other circuits have found similar definitions of "occurrence" to be ambiguous, but it was not persuaded in this case. *Id.*
[243] *Id.* at 545.
[244] *Id.* at 543.

single occurrence, there was only one occurrence of employee dishonesty over the ten year period."[245] The case law distinguishes between independent acts by multiple employees and a series of related acts by a single employee.

The applicable jurisprudence suggests that if the policy language is ambiguous regarding whether thefts by multiple employees constitute separate occurrences, such ambiguity should be resolved in favor of the insured – here, Doucet-Speer.[246]  Applying the relevant case law and policy language, it is not unreasonable to conclude that the systemic and similar thefts by each person is one occurrence as they each had their own consistent scheme. The independent nature of each employee's actions – based on the facts before the court – aligns with the findings in *Ran-Nan Inc.*, supporting Doucet-Speer's position.  If each employee's independent dishonest act is a separate occurrence, Doucet-Speer would be entitled to a claim for each theft as a separate occurrence under the policy limit.  Thus, State Farm's motion is denied to the extent is seeks summary judgment under the terms of the Employee Dishonesty Endorsement.

### b. Forgery or Alteration Provisions

Doucet-Speer seeks additional coverage under other policy provisions for the employee thefts.[247] Doucet-Speer asserts that the "Forgery or Alteration" provision of the Policy also provides coverage for the distinct acts of its employees.  It provides:

---

[245] *Id.* at 543-44.

[246] *See e.g. Howard, Weil, Labouisse, Friedrichs, Inc. v. Insurance Co. of North America*, 557 F.2d 1055 (5th Cir. 1977) (finding that ambiguity must be resolved against insurer, particularly where the construction urged by the insurer would operate to limit coverage) (affirming the application of a single deductible where the employee's dishonesty consisted of a trades and two bad checks that were parts of a single ongoing episode resulting in a single loss).

[247] Rec. Doc. 41 at pp. 3-4. Doucet-Speer makes a general conclusory assertion that it should have been covered up to the $2 million aggregate based on alleged representations by Hargrove and based on Speer's "reasonable expectation of coverage" and the "intention of the insured" to cover potential losses from theft. Rec. Doc. 103 at pp. 16-17. However, Doucet-Speer asserts no claims against Hargrove. *Id.* As discussed

> We will pay for loss resulting from forgery or alteration of any check, draft, promissory note, bill of exchange or similar written promise of payment in 'money' that you or your agent has issued, or that was issued by someone who impersonates you or your agent."[248]

Doucet-Speer cites Saltzman's report identifying several instances of checks and promissory notes being forged by its former employees.[249] Doucet-Speer contends State Farm's retained expert Pham "focuses an entire section on the issue of Forging of Signatures as an attempt to posit that the forgery was condoned.[250] Thus, Doucet-Speer contends State Farm's Statement of Facts ignores these provisions of the Policy, and even assuming the undisputed facts as true, the Court cannot grant summary judgment in State Farm's favor.[251]

State Farm counters that the forgery provision of the Policy does not apply under the facts of this case.[252] State Farm contends that, as noted in Pham's expert report, there is no mention in Saltzman's report of forging Speer's signature.[253]  Text messages between Speer and Mouton and Toucheck show numerous instances where Speer instructed employees to sign his name on checks and, in one instance, Speer himself

---

herein, Hargrove is not a named party, and Plaintiffs do not assert claims against Hargrove for detrimental reliance or for failure to procure insurance coverage. Rec. Docs. 41, 108.

   Further, in looking to the "intentions of the parties," a Court looks to facts as to "the intentions of the parties at the time they executed the contract." *Hinkle v. USAA Gen. Indem. Co.*, 326 F.Supp.3d 249 (M.D. La. Aug. 8, 2018) (quoting *Ashy v. Migues*, 760 So. 2d 440, 447 (La. App. 3 Cir. 2000)). When interpreting a contract, courts should be careful not to do so in an unreasonable or absurd manner. *Winn v. Nation*, 893 So. 2d 133, 135 (La. App. 2 Cir. 2005). Moreover, when a policy can be construed from the four corners alone, looking to extrinsic evidence is improper. *See Peterson v. Schimek*, 729 So. 2d 1024, 1029 (La. 1999)). Regardless, no specific factual evidence is presented by Doucet-Speer regarding the intentions of the parties at the time they executed the contract. Instead, it appears that the only alleged conversation as to coverage took place after the insured procured coverage and after the loss was sustained. Rec. Doc. 103 at pp. 16-18. Yet again, no claims are being made as to Hargrove. Nevertheless, reliance on oral representations is unreasonable because "insurance contracts must be in writing." *Brown v. Phoenix Life Ins. Co.*, 843 F. App'x 533, 545–46 (5th Cir. 2021).

[248] Rec. Doc. 41 at pp. 3-4.
[249] *Id.* at p. 4.
[250] *Id.* (citing Rec. Doc. 102-3 at p. 19).
[251] Rec. Doc. 103 at p. 4.
[252] Rec. Doc. 107.
[253] *Id.* at p. 2 (citing Rec. Doc. 102-3 at p. 49).

admitted placing a client's signature on a settlement check.[254] Speer testified that his office manager Mouton had signature rights on the firm's operating account.[255]

State Farm maintains Doucet-Speer would need to prove that forgeries occurred with regard to the operating account and/or the client trust bank account to recover under the Forgery or Alteration provision of the policy, which had a $10,000 limit.[256] State Farm contends no criminal charges have been filed in Lafayette Parish against Mouton, Toucheck, or any other Doucet-Speer employee.[257]

To establish the coverage under additional policy provisions, Doucet-Speer bears the burden of proving that the incident giving rise to a claim falls within the policy's terms.[258] Thus, Doucet-Speer is required to establish the existence of "the forgery or alteration" within the terms of the Policy. As shown by State Farm, Mouton had signature rights on the firm's operating account.[259] Further, Speer instructed his employees on numerous instances to sign his name on checks.[260] Doucet-Speer offers no evidence of the alleged forgeries other than Speer's own self-contradicting testimony and the forensic accounting to establish the loss. As for a forensic analysis or evidence of the actual forgeries or alterations, however, the evidence is insufficient. And there is some record evidence that, in many instances, Speer had employees sign on his behalf, even absent signature rights.  Thus, Doucet-Speer fails to establish that the alleged acts of theft and forgery were covered under the Forgery or Alteration provision.

---

[254] *Id.* (citing Rec. Doc. 102-3 at p. 49).
[255] *Id.* (citing Rec. Doc. 97-5 at pp. 26-27).
[256] *Id.* (citing Rec. Doc. 97-4 at pp. 6, 67).
[257] Rec. Doc. 107 at p. 2.
[258] *Coleman v. Sch. Bd. of Richland Par.*, 418 F.3d 511, 517 (5th Cir. 2005) (citing *Doerr v. Mobil Oil Corp.*, 2000-0947 (La. 12/19/00), 774 So.2d 119, 124).
[259] Rec. Doc. 107 at p. 2 (citing Rec. Doc. 97-5 at pp. 26-27).
[260] *Id.* (citing Rec. Doc. 103-2 at pp. 50-51).

### c. Loss of Income and Extra Expense Provision

Doucet-Speer also contends the Policy contains a "Loss of Income and Extra Expense" Endorsement that provides:

> We will pay for the actual "Loss of Income" you sustain due to the necessary "suspension" of your operations "during the period of restoration." The "suspension" must be caused by accident direct physical loss to the property at the described premises.[261]

Doucet-Speer argues that the "Loss of Income and Extra Expense" endorsement does not define "a direct physical loss;" thus, it contends the Court shall rely on the dictionary definition of the word "loss."[262] Doucet-Speer claims Saltzman demonstrated that Doucet-Speer incurred financial losses.[263]

State Farm counters that the loss of income/extra expense endorsement of the Policy does not apply under the facts of this case,[264] and Doucet-Speer cannot establish loss of income/extra expense endorsement within the terms of the Policy, which is his burden.[265]

The Loss of Income and Extra Expense endorsement specifically states that a loss of income is covered when there is a necessary "suspension of operations" during the period of restoration.[266] The Policy provides that "suspension" must be caused by "accidental direct physical loss to property at the described premises. The loss must be caused by a Covered Cause of Loss."[267] The Policy provides for exclusions to covered

---

[261] Rec. Doc. 103 at p. 3.
[262] *Id.*
[263] *Id.*
[264] Rec. Doc. 107.
[265] *Coleman v. Sch. Bd. of Richland Par.*, 418 F.3d 511, 517 (5th Cir. 2005) (citing *Doerr v. Mobil Oil Corp.*, 2000-0947 (La. 12/19/00), 774 So.2d 119, 124).
[266] Doc. 107 at p. 3 (citing Rec. Doc. 97-4 at p. 32).
[267] *Id.* at p. 3 (citing Rec. Doc 97-4 at p. 32).

causes of loss, dishonest or criminal acts, or employee theft.[268] State Farm contends the claimed acts of forgery are not caused by an accidental direct physical loss and are not covered under the Loss of Income portion of the policy, except through the Employee Dishonesty Endorsement under which the claim was paid.[269]

The Policy provides the following:

1. Loss of Income

a. We will pay for the actual "Loss of Income"    you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by accidental direct physical loss to property at the described premises. The loss must be caused by a Covered Cause of Loss. . . .

* * *

b. We will only pay for "Loss of Income" that you sustain during the "period of restoration" that occurs after the date of accidental direct physical loss and within the number of consecutive months for Loss of Income and Extra Expense shown in the Declarations. We will only pay for "ordinary payroll expenses" for 90 days following the date of accidental direct physical loss.

2. Extra Expenses

a. We will pay necessary "Extra Expense" you incur during the "period of restoration" that you would not have incurred if there had been no accidental direct physical loss to property at the described premises. The loss must be caused by a Covered Cause Of Loss. . . .[270]

As the Policy clearly indicates, dishonest or criminal acts are unambiguously excluded from covered causes of loss as follows:

**SECTION I – COVERED CAUSES OF LOSS**

We insure for accidental direct physical loss to Covered Property unless the loss is:

**1.** Excluded in **SECTION I – EXCLUSION**; or

---

[268] *Id.* (citing Rec. Doc. 97-4 at pp. 61-64).
[269] *Id.* at p. 4.
[270] Rec. Doc. 97-4 at pp. 32-33.

**2.** Limited in the Property Subject to Limitations provision.[271]

\* \* \*

**SECTION I – EXCLUSIONS,** as modified by CMP-4561.1 Policy Endorsement

\* \* \*

**f. Dishonesty**

**(1)** Dishonest or criminal acts by you, anyone else with an interest in the property, or any of your or their partners, "members", officers, "managers", employees, directors, trustees, authorized representatives, whether acting alone or in collusion with each other or with any other party; or

**(2)** Theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion applies whether or not an act occurs during your normal hours of operation.

This exclusion does not apply to acts of destruction by your employees; but theft by your employees is not covered.[272]

As to the Loss of Income and Extra Expense Endorsement, Doucet-Speer fails to establish that its losses were caused by an "accidental direct physical loss" to its premises, as required under the terms of the policy.  As such, Doucet-Speer fails to establish coverage exists under the Loss of Income and Extra Expense provision of the Policy.

**2. Doucet-Speer is not entitled to mental anguish and emotional distress damages.**

State Farm also correctly notes that Doucet-Speer did not contest the dismissal of its claims for damages in the form of mental anguish and emotional distress.[273]  "[L]imited

---

[271] *Id.* at p. 61.
[272] Rec. Doc. 97-4 at pp. 61, 21.
[273] Rec. Docs. 97-2 at p. 6. 103, 107 at p. 1.

liability companies cannot sustain damages for mental anguish."[274]    Therefore, Doucet-Speer cannot claim mental anguish and emotional distress damages, and these claims should be dismissed.

### 3. Doucet-Speer fails to establish arbitrary and capricious, or "vexatious," conduct to support claims for bad faith penalties and attorney's fees against State Farm.

Turning to Doucet-Speer's bad faith claims, State Farm argues Doucet-Speer fails to prove that State Farm's actions were arbitrary, capricious, or without probable cause.[275] Doucet-Speer alleges it filed a claim with State Farm and began mitigating its loss as quickly as possible by paying off all debt to third parties created by Speer's former staffs' actions.[276] Doucet-Speer further alleges that, on or about December 2, 2019, a notarized Proof of Loss affidavit along with an itemized list of liabilities owed by Doucet-Speer were presented to State Farm.[277] State Farm sent back blank copies of State Farm's forms and asked that the Proof of Loss be resubmitted using the forms.[278] Speer allegedly did so and returned the forms on or about December 12, 2019.[279] After 60 days had passed, Speer allegedly began to press Hargrove and the underwriting department of the CGL Policy.[280] Doucet-Speer alleges State Farm denied the claim, except for the Employee Dishonesty Coverage, and tendered a check in the amount of $10,000,

---

[274] *Fetty v. Louisiana State Bd. of Priv. Sec. Examiners*, 611 F. Supp. 3d 230, 247 (M.D. La. 2020) (citing *Pontchartrain Gardens, Inc. v. State Farm Gen. Ins. Co.*, No. 07-7965, 2009 WL 86671, at *3 (E.D. La. Jan. 13, 2009) (citing *AT & T Corp. v. Columbia Gulf Transmission Co.*, No. 07-1544, 2008 WL 4585439 at *3 (W.D. La. Sept. 15, 2008)); *see also One River Place Condo Ass'n v. Axis Surplus Ins. Co.*, 629 F.Supp.2d 613, 617 (E.D. La. May 8, 2009) ("[N]either corporations nor limited liability companies can incur damages for mental anguish or emotional distress.").
[275] Rec. Doc. 97-2 at pp. 17-18.
[276] Rec. Doc. 41 at p. 4.
[277] *Id.*
[278] *Id.*
[279] *Id.*
[280] *Id.*

ignoring its own set deductible amount,[281] and State Farm failed to timely tender insurance proceeds despite receiving satisfactory proof of loss.[282]

Doucet-Speer dedicates a one paragraph response to State Farm's assertions as to the bad faith claims,[283] arguing that State Farm fails to offer any evidence to support that it was not arbitrary and capricious.[284] Further, in conclusory fashion, Doucet-Speer claims Speer's Affidavit, along with his anticipated testimony at trial,[285] "creates the presumption that Plaintiff will carry its burden at trial and that State Farm has identified no evidence in response to the allegations in the lawsuit."[286]

Speer attested that Doucet-Speer sustained financial losses due to widespread theft, fraudulent acts, forgeries, conversions, etc. by and between its former employees.[287] He also attested that, "[o]nce these losses were discovered, I submitted a Sworn Proof of Loss to State Farm, detailing the financial damages sustained."[288] Speer attested that "State Farm, at no point in time, contacted me individually or commenced any investigations into the losses that were detailed in the Sworn Proof of Loss despite the fact that State Farm provided me with the Sworn Proof of Loss form that was used."[289] He further attested "[t]o my knowledge, State Farm, to date, has never contacted my former office to confer with any staff member, client, or anyone regarding the losses detailed in the Sworn Proof of Loss."[290]

---

[281] *Id.*
[282] *Id.* at p. 6.
[283] Rec. Doc. 103 at pp. 15-16.
[284] Rec. Doc. 103 at p. 15.
[285] Speer passed away after the filing of Doucet-Speer's Opposition. Rec. Doc. 109.
[286] Rec. Doc. 103 at pp. 15-16.
[287] Rec. Doc. 103-5 at p. 1.
[288] *Id.*
[289] *Id.*
[290] *Id.*

Doucet-Speer seeks penalties under La. R.S. 22:1892 and La. R.S 22:1973.[291] The Louisiana Insurance Code places "a duty of good faith and fair dealing" on insurers, "including 'an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured.'"[292] A plaintiff that proves an insurer's breach of its duty to adjust claims fairly and promptly—*i.e.*, an insurer's bad faith—may recover statutory penalties, including double damages,[293] and attorneys' fees and costs.[294] Louisiana's statutes assigning penalties for an insurer's bad faith "are penal in nature and must be strictly construed."[295]

A plaintiff asserting bad faith against an insurer must show that his insurer: "(1) received satisfactory proof of loss, (2) failed to pay within the required time, and (3) acted in an arbitrary and capricious manner."[296] Importantly, the Louisiana Supreme Court has repeatedly emphasized that the third element—that the insurer acted in an "arbitrary and capricious" manner—is satisfied *only* by proof that the insurer's conduct was "vexatious."[297] Further, "'vexatious refusal to pay' means unjustified, without reasonable or probable cause or excuse."[298] Thus, "arbitrary and capricious" or "vexatious" conduct describes "an insurer whose willful refusal of a claim is not based on a good-faith defense."[299]

---

[291] Rec. Doc. 41 at pp. 5-10.
[292] *Est. of Christman v. Liberty Mut. Ins. Co.*, No. CV 20-00739-BAJ-RLB, 2022 WL 481435, at *5–6 (M.D. La. Feb. 16, 2022) (citing *Hammerman & Gainer, LLC v. Lexington Ins. Co.*, No. 18-cv-6729, 2019 WL 2603637, at *6 (E.D. La. June 25, 2019) (Brown, C.J.)); *see also* La. R. S. § 22:1892.
[293] La. R.S. § 22:1973(C).
[294] La. R.S. § 22:1892.
[295] *Est. of Christman*, 2022 WL 481435, at *5-6 (citing *Gaspard v. S. Farm Bureau Cas. Ins. Co.*, 2013-0800 (La. App. 1 Cir. 9/24/14), 155 So. 3d 24, 37).
[296] *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 297 (5th Cir. 2009).
[297] *Reed v. State Farm Mut. Auto. Ins. Co.*, 2003-0107 (La. 10/21/03), 857 So. 2d 1012, 1021.
[298] *Id.* (quoting *Louisiana Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London*, 616 So. 2d 1250, 1253 (La. 1993)).
[299] *Id.*

Nevertheless, statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense. Particularly when there is a reasonable and legitimate question as to the extent and causation of a claim, bad faith should not be inferred from an insurer's failure to pay within the statutory time limits when such reasonable doubts exist.[300] "When an insurer has a good-faith reason to believe that an exclusion bars coverage, it does not act in bad faith by not paying on the claim and instead choosing to litigate the question of coverage."[301] The burden is on the claimant to prove arbitrariness and capaciousness or lack of probable cause.[302] Also, when a reasonable disagreement exists between an insurer and an insured, the insurer is not arbitrary and capricious or without probable cause to deny payment on the claim that is in dispute.[303] Whether an insurer's action was arbitrary, capricious, or without probable cause is essentially a fact issue to be determined by the trial court.[304] However, summary judgment has been found to be appropriate when there is no evidence of an insurer's bad faith conduct.[305]

When questioned if he disputed that the sworn proof of loss was not sent to State Farm until February of 2020, Speer could not remember the date; he only recalled that it was after the second visit by Hargrove.[306] When asked if he had facts to support his assertion that State Farm did not timely investigate his claim, Speer recalled he submitted

---

[300] *Id.* (citing *Rudloff v. Louisiana Health Services and Indemnity Co.*, 385 So.2d 767, 771 (La. 1980)).
[301] *Bellina v. Liberty Mut. Ins. Co.*, No. 19-cv-13711, 2021 WL 1295018, at *7 (E.D. La. Apr. 7, 2021) (Vance, J.).
[302] *McDonald v. Am. Fam. Life Assurance Co. of Columbus*, 10-1873 (La. App. 1 Cir. 7/27/11), 70 So.3d 1086, 1093.
[303] *Id.*
[304] *Reed*, 857 So.2d at 1021.
[305] *See Duhon v. State Farm Mut. Auto. Ins. Co.*, 06-1413 (La. App. 3 Cir. 3/7/07), 952 So.2d 908; *Jouve v. State Farm Fire & Cas. Co.*, 10-1522 (La. App. 4 Cir. 8/17/11), 74 So.3d 220, 225-28, *writ denied*, 11-2250 (La. 11/23/11), 76 So.3d 1157.
[306] Rec. Doc. 97-5 at p. 94.

a proof of claim form with $2 million in damages listed but received no return contact.[307]

Speer acknowledged he did not have the dates his claim was submitted,[308] but he testified

that he had no basis to dispute that it was submitted in February of 2020.[309]

When asked what evidence supported his untimely investigation claim, Speer

testified, "Nobody ever called me up and investigated anything that was on that proof of

claim form, nor did anybody say, 'Jeff, you know, we looked at it and decided no, you're

not covered[.]'"[310] But Speer admitted he could not recall a March 7, 2020 telephone

conference with a State Farm adjuster to review the documents and details of the loss.[311]

Speer also admitted he suffered from health issues that affected his memory and testified

that he could not swear one way or another about a date that he cannot recall.[312] He

further testified: "I just know that I should have been paid more than that 10 grand when

I was assured I had the coverage."[313] He admitted conflating the issue of timeliness and

the amount paid: "To me, it's all the same."[314]

The Court finds that Doucet-Speer has offered no evidence to support its

conclusory allegations that State Farm acted in an arbitrary and capricious manner.

There is no record evidence showing the exact date it allegedly submitted a satisfactory

proof of loss to support the claim that State Farm failed to pay within the required time.[315]

---

[307] *Id.* at pp. 94-95.
[308] *Id.* at p. 95.
[309] *Id.*
[310] Rec. Doc. 97-5 at pp.95-96.
[311] *Id.* at p. 96.
[312] *Id.* at pp. 96-97.
[313] *Id.* at p. 97.
[314] *Id.*
[315] Even with "satisfactory proof of loss," State Farm's denial other than payment of the Employee Dishonesty Endorsement Limit was justified because there was a "reasonable and legitimate" question as to additional coverage of the property damages. *NAZ, L.L.C. v. United Nat'l Ins. Co.*, 779 F. App'x 200, 205 (5th Cir. 2019) (quoting *Guillory v. Lee*, 2009-0075 (La. 6/26/09), 16 So. 3d 1104, 1112).

There is also no evidence before the Court to conclude that State Farm's conduct was "vexatious" and, thus, arbitrary and capricious.[316] Moreover, it is undisputed that State Farm paid Doucet-Speer the $10,000 limit for the Employee Dishonesty Endorsement Limit.[317] Accordingly, Doucet-Speer has failed to demonstrate a triable issue as to bad faith penalties and attorney's fees under La. R.S. 22:1892 and La. R.S. 22:1973, and State Farm is entitled to summary judgment on these claims.

---

[316] *Reed v. State Farm Mut. Auto. Ins. Co.*, 2003-0107 (La. 10/21/03), 857 So. 2d 1012, 1021.
[317] Rec. Docs. 97-3 at p. 2 (citing Rec. Doc. 97-5 at p. 14), 103-1.

III.    **CONCLUSION**

For the foregoing reasons, Doucet-Speer's Motion for Partial Summary Judgment[318] is DENIED. State Farm's Motion for Summary Judgment[319] is GRANTED IN PART and DENIED IN PART. State Farm's motion is GRANTED to the extent it seeks dismissal of Jeffrey Speer's individual claims and to the extent it seeks dismissal of Doucet-Speer's claims for mental anguish, emotional distress, bad faith penalties, and attorney's fees under La. R.S. 22:1892 and La. R.S. 22:1973. State Farm's motion is otherwise DENIED on all other claims.

The following claims are DISMISSED WITH PREJUDICE: (1) All individual claims made by Jeffrey Speer against State Farm; and (2) Doucet Speer's claims against State Farm for mental anguish, emotional distress, bad faith penalties, and attorney's fees under La. R.S. 22:1892 and La. R.S. 22:1973.

Signed in Baton Rouge, Louisiana on May 29, 2025.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[318] Rec. Doc. 95.
[319] Rec. Doc. 97.